# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00674-CV

**Margo Millie Romero, Appellant**

**v.**

**Alejandro Alberto Arguello, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. D-1-FM-14-001954, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Margo Millie Romero and appellee Alejandro Alberto Arguello are the parents of H.R.A., their daughter who was five years old at the time of the hearing. In July 2011, in an order entered in a suit affecting the parent-child relationship (SAPCR), Romero was named the conservator with the right to determine H.R.A.'s primary residence, limited to Hays County and contiguous counties.[1] In 2014, Romero filed a motion to modify, asking that the geographic restriction be removed because her husband, an active-duty member of the United States Air Force, had been stationed in North Dakota. Arguello objected. Following a hearing, the trial court signed an order denying Romero's request. Romero then filed this appeal. We affirm the trial court's order.

---

[1] A trial court in Hays County issued the 2011 order. After H.R.A., Romero, and Arguello all moved to Travis County, the SAPCR was transferred to Travis County.

## Standard of Review

A trial court may modify an order governing the conservatorship of a child if the change would be in the child's best interest and if the circumstances of the parents or the child have materially and substantially changed since the order was rendered. Tex. Fam. Code § 156.101(a)(1). We will not disturb a trial court's decision on a motion to modify unless the complaining party shows a clear abuse of discretion, meaning the trial court acted in an arbitrary and unreasonable manner or without reference to guiding principles. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). We ask first whether the trial court had sufficient information on which to exercise its discretion and second whether it erred in applying its discretion. *Id*. at 477-78. A "traditional sufficiency review comes into play with regard to the first question," followed by a determination of "whether, based on the elicited evidence, the trial court made a reasonable decision." *Id.* at 478. The trial court is best able "to observe the demeanor and personalities of the witnesses and [to] 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Id.* at 477. The fact that we might decide the issue differently than the trial court does not establish an abuse of discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). "An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Id.*

Texas' public policy is to ensure that a child has frequent and continuing contact with her parents, if her parents have shown they can act in the child's best interest; to provide the child with a safe, stable, and nonviolent environment; and to encourage parents to share in the raising of their child after separation. Tex. Fam. Code § 153.001(a). A child's best interest is the overarching

2

concern in matters concerning conservatorship, possession, and access to the child. *Id*. § 153.002. In *Lenz v. Lenz*, the supreme court considered cases from other jurisdictions related to relocation and conservatorship and stated that the following factors "reflect the public policy concerns implicit in Texas' own statutory best-interest standard of modification": the parents' good-faith reasons for and against the proposed move; a comparison of economic, educational, health, and leisure opportunities for the custodial parent and the child; whether the child's special needs or talents can be accommodated; the effect on the child's extended family relationships; the effect the move would have on the noncustodial parent's visitation and communication and his ability to maintain a full and continuous relationship with the child; whether the noncustodial parent has the ability to relocate; and whether a visitation schedule could be arranged that would allow the noncustodial parent to continue a meaningful relationship with the child. 79 S.W.3d 10, 15-16 (Tex. 2002); *see In re M.M.M.*, 307 S.W.3d 846, 850 (Tex. App.—Fort Worth 2010, no pet.); *Deinhart v. McGrath-Stroatman*, No. 03-09-00283-CV, 2010 WL 4595708, at *6 (Tex. App.—Austin Nov. 10, 2010, pet. denied) (mem. op.). However, we must remember that "no bright-line test can be formulated" and that suits involving the custody of children "are intensely fact driven" and require the consideration and balancing of numerous factors. *Lenz*, 79 S.W.3d at 18-19.

## Factual Summary

At the time of the hearing, H.R.A. was five years old. Romero testified that she and Jeffrey Romero started dating in August 2011, shortly after the original conservatorship order was signed, and married in November 2012. They have a daughter together who was born in July 2012, and Romero said H.R.A. and her younger sister are very attached to each other. Jeffrey signed his

3

Air Force enlistment papers in June 2012 and began training in April 2013. He had been assigned to a base in North Dakota, and Romero believed that the assignment would last "more than two to three years." Romero testified that North Dakota was more affordable, that everything was within walking distance, and that medical costs would be cheaper. If she was forced to stay in Austin, the family would have to maintain two households and she would have to put the children into daycare and find a full-time job instead of being a stay-at-home parent. She also said that to visit Jeffrey, the family would have to pay over $1,000 in plane tickets and that he would have limited time in which he would be allowed to leave the base. She was afraid that the costs would be so high that the family would not get to be together very often. Romero said that if she and the girls were allowed to relocate to North Dakota, she was open to giving Arguello longer summer visits, to letting Arguello come visit H.R.A., and to allowing him to video-chat with her every night. She thought Arguello should have to pay for his own travel costs if he wanted to come to North Dakota but was willing to split H.R.A.'s travel costs to and from Austin and to travel with H.R.A. on those trips.

Romero testified that her parents, Jeffrey's parents, Arguello's parents, and all of Arguello's extended family were in the central Texas area. Romero said that Arguello exercised visitation and that H.R.A. seems to enjoy Arguello's company, "but it also seems to me like they have more of a friendship than a father-daughter relationship when she's with him. He doesn't give her discipline or rules or restrictions." She explained that Arguello let H.R.A. stay up late and watch programs that were inappropriate for her age and that H.R.A. would come home from visits with Arguello with a bad attitude. Romero testified that she was the parent who attended parent-teacher conferences and took H.R.A. to appointments and extracurricular activities and said that

4

since she had filed her motion to modify, Arguello had become more involved, such as asking about parent conferences and starting to attend part of H.R.A.'s early evening dance classes. Romero also stated that Arguello was disrespectful to her and Jeffrey and was hard to co-parent with.

She believed that her bond with H.R.A. was the most important bond in her life and did not think it would be harmful for H.R.A. to not see her extended family as often. She agreed that H.R.A.'s bond with Arguello was important and said "that's why I'm willing to give him extra time, and I'm willing to accommodate his needs when it comes to communicating with her." She agreed that H.R.A. would get to spend the most time with Arguello if she stayed in Austin but said, "I also have another daughter."

Jeffrey testified that he enlisted to provide for his family and give them a better life. He said that if the geographic restriction was lifted, "I can foresee myself—serving our country for a career. It's only benefitting my family and it's only opened doors for us," but if the restriction was not lifted, he would have to reconsider. He explained that if he was unable to live in the North Dakota dormitories, which are usually reserved for unmarried men without dependents, he and Romero would have to use his military housing allowance to maintain two households.

Arguello testified that he did not want to take H.R.A. away from Romero but only wanted to do what was in her best interest. He believed staying in the Austin area was in her best interest "[b]ecause this is what she's used to. She has several cousins she hangs out with. She has more family that she constantly sees. She has a full relationship with them. It allows me to be able to protect her. And if something happens to her, I'm available minutes away. I live, like, 10, 15 minutes away from where she lives now. And if something happens, something goes on, I have the

5

freedom to stop whatever I'm doing to just go to her." He testified that he was involved in H.R.A.'s life and had a close bond to her, and he said, "I want my daughter to know if she has a bad day, she can just call me, and she knows I'll pick her up." He explained that he attended as many of H.R.A.'s activities as he could, but that he worked from 8:30 a.m. to 5:30 p.m., which meant he could not always attend H.R.A.'s activities. Arguello testified that Romero was disrespectful to him and started arguments with him and that she frequently blocked his attempts to talk to H.R.A. on the phone. Arguello agreed that he let H.R.A. stay up late on his weekends with her, saying he thought it was fun for her, and that he sometimes played fights on the television while H.R.A. was present, explaining that she usually watched a child's movie on her tablet while the fights were on.

Arguello believed moving to North Dakota would be hard on H.R.A. because it would uproot her from her long-time home and take her away from her friends and family. He also believed that it would be hard for her to not see him as often and that it "would impact her extremely, just because the person that she's been seeing constantly for five years, now she'll see—she'll hear my voice or maybe during FaceTime. You know, it's not the same. It's not the same from being able to, you know, sit down with me, you know, just me being able to hold her, you know, just tell her that I love her. It's not the same from doing it through the screen." Arguello testified that a flight between Austin and North Dakota takes between five to six hours and costs about $500 (he admitted that the $500 price was not a round-trip price and that round-trip would be less expensive) and that he would also have to rent a car, get a hotel, and eat all of his meals out. He did not believe he could afford to visit H.R.A. in North Dakota even once a month, much less every other weekend. He believed he would only see her "every three months or just during the summer."

6

Arguello said that if H.R.A. were to stay in Austin while Romero and her younger daughter moved to North Dakota with Jeffrey, H.R.A. would stay with him at his parents' house, where he lived. He testified that his mother would take care of her when he was at work and that he would waive any child support obligation from Romero so that she could use that money to visit with H.R.A. He asked the trial court, "Just please allow my daughter to stay here."

Rosa Arguello, Arguello's mother, testified that Arguello lived with her and her husband and that H.R.A. stayed with them during overnight visitations. She said H.R.A. frequently saw and was close to the extended Arguello family, and she did not think she or the extended family would be able to visit H.R.A. in North Dakota. Rosa also testified that she had worked in a child-care center in the past and was currently a nanny for the attorney for whom Arguello works as a legal assistant. If Romero stayed in Austin with H.R.A., Rosa said she would provide after-school childcare for H.R.A. for no cost. Arguello's aunt and sister both testified that they had good relationships with Arguello and H.R.A., that H.R.A. was close to her cousins and other family, and that Arguello was a good father and was very devoted to H.R.A.

At the conclusion of the hearing, the trial court said, "I don't believe that the burden to lift that restriction has been met. So I'm going to deny the request to do that. There's certainly no need to rule on any change of conservatorship, but the domicile restriction for [H.R.A.] will remain in place." The court agreed to change the restriction from Hays to Travis County and contiguous counties. The court made the following findings of fact: Romero married Jeffrey Romero in 2012; Jeffrey enlisted in the Air Force in 2013; Romero was aware of the geographic restriction when she married Jeffrey and when he enlisted; Arguello exercised regular and consistent visitation

7

with H.R.A.; Arguello, Romero, and Jeffrey all have extended family in the central Texas area and those family members had close relationships with H.R.A.; Jeffrey was assigned to North Dakota in early 2014; and Arguello's visitation with H.R.A. would be substantially reduced if H.R.A. was relocated. The court concluded that Romero's marriage, Jeffrey's enlistment, and his assignment to North Dakota constituted a material and substantial change in circumstances but that Romero had not proven that the modification and resulting reduction in visitation with Arguello was in H.R.A.'s best interest. *See* Tex. Fam. Code § 156.101.

**Discussion**

Romero complains that the trial court abused its discretion in denying her motion to modify. She further asserts that the evidence does not support the court's findings that Arguello consistently attended H.R.A.'s extracurricular and school activities, that Arguello's possession time with H.R.A. would be substantially reduced if the child moved to North Dakota, or that H.R.A.'s relationship with Arguello and his family would be negatively affected if she were to move.

No one disputes that Romero has compelling and good-faith reasons to want to move or that Arguello has similar good-faith reasons to want H.R.A. to remain here. The record indicates that H.R.A.'s health, education, and leisure opportunities would be approximately the same under either scenario and that her needs and talents could be met in both locations.[2] There was testimony that H.R.A. is quite close to her extended family on both parents' sides and that if she moved, she

---

[2] As opposed to the situation in *In re D.M.D.*, cited by Romero, there was no evidence that H.R.A. would be better served by resources in North Dakota. *See* No. 05-07-01045-CV, 2009 WL 280465, at *6 (Tex. App.—Dallas Feb. 6, 2009, no pet.) (mem. op.). Further, the trip from Austin to North Dakota is vastly different from a trip between Austin and Dallas. *See id.*

would not see those relatives except on visitations in which she came to Austin. Romero testified that if she moved, she could return to school and could continue being her children's full-time caretaker and that it would impose a financial hardship on the family if she had to stay in Austin, that she would have to find a job outside of the home, and that she would have to pay for after-school and summer care for the children. However, Arguello's mother testified that she would care for H.R.A. free of charge if H.R.A. remained in the Austin area. Arguello said that he was not considering moving to North Dakota and that he was employed here full time, in a job he had held for more than a year. He believed that he could not afford monthly visits to North Dakota and thus that he would probably only see H.R.A. every three months or during summers. Although Romero testified that she would allow Arguello to have daily electronic communication with H.R.A., Arguello testified that Romero frequently interfered with his attempts to speak to H.R.A. on the phone and that he feared that would happen even more frequently if H.R.A. moved. H.R.A. has always lived in central Texas, and her extended family on both sides, as well as Jeffrey's family, is here.

We recognize that Romero and her new family are put in a difficult position, both emotionally and financially, by the trial court's refusal to lift the geographic restriction. However, the court had to make a choice between imposing a financial and emotional hardship on Romero and Jeffrey during Jeffrey's assignment in North Dakota and taxing H.R.A.'s close relationship with her father and her extended family. *See In re M.C.M.*, No. 11-13-00375-CV, 2014 WL 3698283, at *6-7 (Tex. App.—Eastland July 17, 2014, no pet.) (mem. op.) ("the custodial parent's improved financial situation and the effect on the noncustodial parent's right to have regular and meaningful contact are only two of several factors courts balance in the fact-driven analysis to determine whether a

9

geographic restriction is in the best interest of the child"). There was substantive and probative evidence on which the court could decide that Romero had not shown that allowing the move to North Dakota would be in H.R.A.'s best interest. *See Lenz*, 79 S.W.3d at 15-16.[3] We cannot hold on this record that the trial court abused its discretion in refusing to lift the geographic restriction on H.R.A.'s place of residence. *See Bates v. Tesar*, 81 S.W.3d 411, 434-35 (Tex. App.—El Paso 2002, no pet.) ("While perhaps we would not have reached the same decision, the findings are supported by legally and factually sufficient evidence."). We overrule Romero's first issue.

As for Romero's complaints about the sufficiency of the evidence supporting the trial court's findings that Arguello "consistently attended extracurricular activities and activities at the child's school," that allowing H.R.A. to move to North Dakota would substantially reduce Arguello's possession time with her, and that the child's relationship with Arguello and his extended family

---

[3] Most of the cases Romero cites and we have surveyed involve an appellate court *affirming* a trial court's modification decision, observing no abuse of discretion. *See, e.g.*, *In re C.M.*, No. 04-12-00395-CV, 2014 WL 2002843, at *4 (Tex. App.—San Antonio May 14, 2014, no pet.) (mem. op.) (affirming trial court's decision to lift geographic restriction); *In re B.A.B.*, No. 13-11-00457-CV, 2012 WL 112822, at *8-9 (Tex. App.—Corpus Christi Jan. 12, 2012, no pet.) (mem. op.) (affirming trial court's lifting of geographic restriction); *Hoffman v. Hoffman*, No. 03-03-00062-CV, 2003 WL 22669032, at *6-7 (Tex. App.—Austin Nov. 13, 2003, no pet.) (mem. op.) (affirming trial court's refusal to change primary conservatorship from mother, who was moving out of state, to father); *Echols v. Olivarez*, 85 S.W.3d 475, 482 (Tex. App.—Austin 2002, no pet.) (affirming trial court's decision to lift restriction and allow mother to relocate with child); *Bates v. Tesar*, 81 S.W.3d 411, 433-35 (Tex. App.—El Paso 2002, no pet.) (affirming trial court's imposition of geographic restriction); *see also Panalez v. Telano*, No. 03-14-00675-CV, 2015 WL 7422972, at *4 (Tex. App.—Austin Nov. 19, 2015, no pet.) (mem. op.) (affirming jury's finding that geographic restriction should be lifted); *Yasin v. Yasin*, No. 03-10-00774-CV, 2011 WL 5009895, at *4-5 (Tex. App.—Austin Oct. 21, 2011, no pet.) (mem. op.) (affirming trial court's decision to omit geographic restriction from initial conservatorship order); *Cisneros v. Dingbaum*, 224 S.W.3d 245, 259-60 (Tex. App.—El Paso 2005, no pet.) (same). In contrast, Romero is asking us to *reverse* the trial court's decision on her motion to modify, which we cannot do absent an abuse of discretion.

would be negatively impacted, we have reviewed the record and are satisfied that legally and factually sufficient evidence supports those findings. It is not for us to second-guess the court's determinations of credibility and the weight to be given the evidence, and we decline Romero's invitation to do so. *See In re P.A.C.*, No. 14-14-00799-CV, 2016 WL 3213299, at *2 (Tex. App.—Houston [14th Dist.] June 9, 2016, no pet. h.) (setting out standards applied in conducting sufficiency review). We overrule Romero's second and third issues.

## Conclusion

Having overruled Romero's challenges to the trial court's decision on her motion to modify, we affirm the trial court's order.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   July 21, 2016

11